UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

EnergyNorth Natural Gas, Inc.

    v.                        Civil No. 99-cv-049-JD

Century Indemnity Company, et al.

O R D E R

Following a jury verdict and entry of judgment in favor of
EnergyNorth Natural Gas, Inc., the defendants, Century Indemnity
Company, Certain Underwriters at Lloyd's, London, and Certain
London Market Insurance Companies ("LMI"), move for judgment as a
matter of law or, alternatively, a new trial.  EnergyNorth
opposes the defendants' motion and moves for clarification of the
court's order of November 16, 2005.  The motions are resolved as
follows.

I.  Defendants' Motion

The defendants contend that they are entitled to judgment as
a matter of law "because the unrefuted evidence presented at
trial showed that [EnergyNorth] intentionally disposed of
[manufactured gas plant] waste, including tar, during the 1969
demolition of Holder 2 and from a network of drains connecting to
the Van Buren Street sewer that discharged onto the riverbank of
the Nashua River and surrounding wetlands, and therefore engaged
in inherently injurious activity."  Alternatively, the defendants

seek a new trial on the grounds that the jury ignored the
instruction on inherently injurious activity; the jury verdict is
against the weight of the evidence, the court erroneously
excluded the defendants' witness, Rene Briand, and the jury
instructions were incorrect.  EnergyNorth opposes the motion on
both theories.

In this case, EnergyNorth sought insurance coverage from the
defendant insurers for its liability to pay for the costs of
cleaning up contamination of the Nashua River and ground water
caused by tar that was a byproduct of the manufactured gas plant
operations at its Nashua plant.  The defendant insurers denied
coverage, asserting among other things that the contamination was
not accidental, as required by their policies, that coverage for
at least part of the damage was barred by pollution exclusions in
some of the policies, and that they were not obligated to
indemnify EnergyNorth for costs that would be paid by Public
Service of New Hampshire.  The court granted EnergyNorth's motion
for judgment as a matter of law on the pollution exclusion,
removing that issue from the jury's consideration.  After nine
days of trial, the jury found that the defendant insurers failed
to prove that any part of the contamination at the Nashua site
was intentional.

A.  Judgment as a Matter of Law

     Federal Rule of Civil Procedure 50(b) permits a party to
renew its motion for judgment as a matter of law after entry of
judgment against that party.  The jury's verdict will not be set
aside, however, "unless the evidence, together with all
reasonable inferences in favor of the verdict, could lead a
reasonable person to only one conclusion, namely, that the moving
party was entitled to judgment."  Rodriguez-Marin v. Rivera-
Gonzalez, --- F.3d ---, 2006 WL 348575 at *6 (1st Cir. Feb. 16,
2006) (internal quotation marks omitted).  Therefore, the court's
consideration of a motion for judgment as a matter of law "is
'weighted toward preservation of the jury verdict' because a
verdict should be set aside only if the jury failed to reach the
only result permitted by the evidence."  Quiles-Quiles v.
Henderson, --- F.3d ---,  2006 WL 390471 at *3 (1st Cir. Feb. 21,
2006) (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393 (1st
Cir. 2002)).

     In support of their motion for judgment as a matter of law,
the defendants argue that "the indisputable evidence proves that
a substantial amount of the contamination at the Nashua site was
caused by [EnergyNorth's] inherently injurious activity."[1]  An

_____

     [1]Despite the court's rulings to the contrary, the defendants
continue to suggest that their burden was only to show that a
"substantial amount" of the contamination was intentional.  Their
misunderstanding stems from a ruling early in the case that
property damage which was the result of a continuous pattern of

important consideration in this case, however, is the burden of proof.  Under New Hampshire law, the defendant insurers bore the burden of proving that their policies do not provide coverage for the harm claimed by EnergyNorth.  N.H. Rev. Stat. Annot. § 491:22-a; Hudson v. Farm Family Mutual Ins. Co., 142 N.H. 144, 146 (1997).  The defendants, for whatever reason, continue to have difficulty appreciating the effect on their case of New Hampshire's burden-shifting law.

In the context of disputes concerning liability insurance coverage, the New Hampshire Supreme Court has "developed two inquiries to determine whether an insured's act was an accidental cause of injury, one subjective, the other objective." EnergyNorth Nat. Gas, Inc. v. Cont'l Ins. Co., 146 N.H. 156, 162 (2001) ("Continental").[2]  The first inquiry is subjective, that is, "'an insured's act is not an accidental contributing cause of

---

discharging pollutants would not be microanalyzed for coverage of any occasional accidental discharges.  Order, June 14, 2002.  As is clear from Judge McAuliffe's order and the case cited therein, Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 938 F.2d 1423, 1429-30 (1st Cir. 1991), "substantial amount" is not the governing rule.

[2]In Continental, the supreme court held that the property damage caused by the intentional discharge of tar and tarry waste, into a body of water, the Tar Pond, was not accidental because the disposal "was certain to contaminate that body of water, particularly where, as here, that waste was known to be insoluble in water and tends to deposit on the shores of a stream in the form of a shiny coating."  Id. at 164 (internal quotation marks omitted).

injury when the insured <u>actually intended</u> to cause the injury
that results.'"  <u>Id.</u> (quoting <u>Vermont Mut. Ins. Co. v. Malcolm</u>,
128 N.H. 521, 523 (1986)).  The second inquiry is objective:  "an
insured's intentional act cannot be accidental when it is so
inherently injurious that 'it cannot be performed without a
certainty that some injury will result.'"  <u>Id.</u> (quoting
<u>Providence Mut. Fire Ins. Co. v. Scanlon</u>, 138 N.H. 301, 306
(1994)).

The defendants assert that "[t]he uncontroverted evidence
presented at trial shows that [EnergyNorth] intentionally
discharged tar and tarry wastes into the Nashua River and
surrounding wetlands during the 1969 demolition of Holder 2 and
through the Van Buren Street sewer."  The jury was asked on the
verdict form whether the defendants had proven that all or any
part of the contamination was intentional, and they answered "NO"
to both questions.  The evidence at trial amply supports the
jury's verdict.

### 1.  Demolition of Holder 2.

The defendants rely on the testimony of Ansel Grandmaison
pertaining to the demolition of Holder 2 in 1969.  Grandmaison
testified that he contracted with Charles Prichard, president of
Gas Services, Inc., to haul away the waste liquid and demolish
the relief holders at the Nashua plant on a cost plus basis.  He

said that he pumped the wastes out of the Holder 2 to be hauled away in tanker trucks for two weeks without emptying the holder. He also testified that he constructed a berm around the holder to contain the liquid wastes.

Grandmaison further testified that at some point someone told him to stop pumping and to fill the holder. He said that when he started filling the holder with debris and soil, the liquid wastes came out of the holder onto the ground and that Prichard ordered that a breach be cut in the berm to let the wastes run down to the Nashua River. Grandmaison said that he refused to cut the berm but that Prichard ordered the bulldozer driver to do it, which he did, allowing tarry wastes to flow down the bank and into the river. The defendants also presented aerial photographs that appeared to show a dark stain from the area of Holder 2 to the river. The defendants' expert witness, Peter McGlew, testified that tarry wastes from the holder caused contamination of the Nashua River.

In opposing the defendants' motion, EnergyNorth notes that two other EnergyNorth employees at the site in 1969, who were aware of Grandmaison's activities and the release of wastes from the holder, did not remember a berm around the holder or that Charles Prichard was involved in releasing tarry wastes into the river. EnergyNorth also challenged Grandmaison's testimony

6

during cross-examination.[3]  Further, Dr. Neil Shifrin, EnergyNorth's expert witness, testified that the soil borings and other evidence did not support the defendants' expert's opinion that a massive release of tarry wastes occurred during the demolition of Holder 2 and caused the present contamination of the river.  Instead, Dr. Shifrin provided his opinion that most if not all of the tar in the river was the result of underground migration of tar and tarry wastes that leaked from the bottoms of the holders and that were accidentally leaked or spilled on the ground during plant operations.

Therefore, contrary to the defendants' interpretation of the trial record, the jury could have reasonably disbelieved that part of Grandmaison's story which held Prichard responsible for a discharge tarry wastes during the demolition of the holder, and instead the jury could have concluded that Grandmaison was

---

[3]Grandmaison's testimony about the berm and his lack of responsibility for a release of tarry wastes was not unequivocal. EnergyNorth points to Grandmaison's concerns about his own liability, issues of time constraints and cost, and demonstrated inconsistencies between his testimony at trial and at his deposition.  Further, without reference to the berm, Grandmaison also testified that he had piles of fill dumped in the area, which he was using to fill the holder, and that on the last day he worked at the site the bulldozer operator was pushing the piles into the holder.  In contrast to his testimony about the flow of wastes into the berm area when Prichard ordered the berm cut, Grandmaison also said that he stopped filling because some of the liquid was coming back out of the holder and was flowing across the railroad tracks and down into the river.

responsible for the release or that any release that occurred was accidental, not intentional.[4]  The jury also could have reasonably concluded that although some wastes were released during the demolition process, based on Dr. Shifrin's testimony, that release was not the cause of the tar contamination in the river.[5]  Taking the evidence about the 1969 demolition of the holder in the light most favorable to the verdict, there is no basis to grant the defendants' motion based on that evidence.

    2.  Sewers.

    The defendants also argue that the evidence at trial proved that EnergyNorth discharged tarry wastes through the sewers into the Nashua River, constituting inherently injurious activity. The defendants rely on the opinions of their expert witness, Dr. Suuberg, about typical plant wastes and the likely uses of the sewer lines during the operation of the plant, and Mr. McGlew's interpretation of river borings to show tar in the area of the sewer outflow.  The defendants disparage Dr. Shifrin's lack of investigation of the possibility of tar contamination from the

---

    [4]Grandmaison's credibility was at issue, and his testimony was such that it was reasonably open to disbelief.

    [5]That the defendants disagree with Dr. Shifrin's opinions does not mean the jury could not reasonably have accepted and relied on those opinions, particularly in comparison to the opinions offered by the defendants' hydrology expert who was not as qualified or as credible as Dr. Shifrin.

sewer, suggesting negative inferences that might be drawn from his testimony.

EnergyNorth points to the evidence at trial that during its operations the plant recycled wastes and sold tar.  Dr. Shifrin testified that although some wastes from the plant, such as storm water runoff and wastes from floor drains, may have drained into the sewers, the work orders and equipment inventories show that tar was separated out of the wastes and was not discharged or dumped.[6]  Dr. Shifrin also testified that the plant would not have stored tarry wastes in holders only to discharge the tar through the sewers and drains.  Dr. Shifrin further testified that the pattern of contamination in the river did not fit the plume that would be caused by discharge of tar from the sewer pipe.

EnergyNorth also notes the testimony by Patricia Haederle, a lead project manager in Keyspan's environmental division, that the New Hampshire Department of Environmental Services accepted EnergyNorth's consultant's conclusion that the sewers were not the source of tar contamination.  Haederle stated that, as part of the investigation of the contamination at the plant site, the area in the river near the outflow of the sewers was examined and

---

[6]It is important to note that the contamination at issue in this case is due to tar rather than other possible pollutants produced by the plant.  Therefore, other wastes, despite their toxicity, are not at issue.

that the investigation found no data to indicate that the sewers were the source of river contamination.

Therefore, based on the evidence at trial, the jury could have reasonably concluded that the contamination was not caused by intentional disposal of tar through the sewers.  The defendants have not succeeded in the "uphill battle" necessary to overturn the jury's verdict against them in this case.  Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005), cert. denied, 2006 WL 385665 (U.S. Feb. 21, 2006).


B.  Motion for a New Trial

The defendants move for a new trial, pursuant to Federal Rule of Civil Procedure 59, contending that the jury ignored the court's instruction on an intentional release of contamination, that the court erred in excluding the testimony of Rene Briand, that the verdict is against the weight of the evidence, and that the court gave incorrect jury instructions and omitted other instructions.  A new trial may be granted following a jury verdict "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  Fed. R. Civ. P. 59(a).  Despite the broad wording of Rule 59(a), "[c]ourts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done."  11

Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal
Practice and Procedure § 2803, at 46 (2d ed. 1995).

### 1.  Jurors ignored instruction.

The defendants complain that "[d]espite the undisputed
evidence that [EnergyNorth] discharged tar and tarry wastes into
the Nashua River, the jury found that none of the contamination
was caused by intentional discharges."  For that reason, the
defendants posit that the jurors must have disregarded the
instruction pertaining to intentional discharges of tar and tarry
waste into a body of water.  Jurors are presumed to follow their
instructions.  United States v. Hatch, 434 F.3d 1, 6 (1st Cir.
2006); Forgie-Buccioni v. Hannaford Bros., Inc., 413 F.3d 175,
180 (1st Cir. 2005); United States v. Lee, 317 F.3d 26, 35 (1st
Cir. 2003).  Although the presumption is rebuttable, "rebutting
it takes more than empty rhetoric."  Correia v. Fitzgerald, 354
F.3d 47, 52 (1st Cir. 2003).

The defendants assert that the evidence of intentional
discharges of tar and tarry wastes was undisputed, but that does
not make it so.  As is discussed above in the context of the
defendants' motion for judgment as a matter of law, there was
evidence on both sides of the question, and there were
credibility issues for the jury to resolve.  Ample evidence
supported the jury's verdict.  Therefore, the jurors could have

11

heeded the instruction and concluded either that no intentional
discharges were made or that any intentional discharges did not
cause the contamination at issue in the case.

   2.  Testimony of Rene Briand.

       EnergyNorth filed an objection to the expected testimony of
Rene Briand, who had been an employee at the Nashua plant for one
year in the late 1940s.  The defendants videotaped his deposition
and intended to play excerpts at trial, particularly pertaining
to his memory of the plant's practice of pumping wastes from a
tank to a pipe that emptied onto the river bank.  Briand said
that he told his supervisor that he was concerned about dumping
the wastes in the river but his supervisor told him not to worry
about it because it was none of his business.  Briand testified
that the wastes in the tank were not tar but were light oils that
he filtered and used as fuel in his car.

       Before trial, the defendants argued that Briand's testimony
was "relevant because it tends to show that [EnergyNorth]
possessed the means to dispose of waste via a pipe into the river
and used those means accordingly."  Response, doc. no. 368, at 3.
They argued that their expert witness, Dr. Suuberg, would testify
that the pipe Briand referred to led to the Van Buren Street
sewer line.  The defendants also referenced plant inventories and
other documentary evidence pertaining to drains and sewer

12

connections at the plant.

The court excluded Briand's testimony because it pertained to the disposal of light oils rather than tar or tarry wastes that were at issue in the case.[7]  The only relevance of such testimony was to suggest that the plant disposed of other toxic wastes through drains and pipes into the river.  As such, the testimony was in the realm of bad act evidence, used to suggest a propensity for such conduct.  Fed. R. Evid. 404(b).  Further, any minimal probative value was far outweighed by the potential for its unfairly prejudicial effect and the likelihood of confusing the jury.  Fed. R. Evid. 403.

The defendants now argue, contrary to their arguments for purposes of the evidentiary ruling at trial, that Briand's testimony "is relevant because, along with the plant inventory and plant plan, it corroborates Dr. Suuberg's testimony that tar-containing MGP equipment at the Nashua plant was connected to the Van Buren Street sewer."  The defendants also now argue, albeit without any citation to evidence at trial or other authority, that light oils or drip oils contain some of the same chemical components as tar and can also cause site contamination.  They further argue that EnergyNorth's counsel's closing argument unfairly highlighted the lack of evidence of sewer discharges.

---

[7]There was no dispute then or now that the contamination at issue in the case was caused by tar, not by light oils.

The defendants' newly minted arguments are too little and too late.  The defendants did not previously argue any chemical relationship between the oils Briand testified were drained into the pipe and the tar that is the cause of the contamination at issue at the site now, nor have they demonstrated such a relationship now.  Further, the defendants did not previously contend that Briand's testimony would make a connection between the drain and pipe and the Van Buren Street sewer.  In fact, nothing in Briand's transcribed testimony suggests that he knew of such a connection.  In contrast, the defendants argued that Dr. Suuberg's testimony and documentary evidence would show the sewer connections.  EnergyNorth's counsel also points out that no objection was made to his closing argument.

The court is satisfied that the exclusion of Briand's testimony was not error and did not cause an injustice.  <u>See</u> <u>Perez-Perez v. Popular Leasing Rental, Inc.</u>, 993 F.2d 281, 281 (1st Cir. 1993).

### 3.  Weight of the evidence.

The defendants also contend that they are entitled to a new trial because the jury's verdict was against the weight of the evidence.  "A district court should only grant such motions if the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice."

Marcano Rivera, 415 F.3d at 171; see also Transamerica Premier
Ins. Co. v. Ober, 107 F.3d 925, 929 (1st Cir. 1997).  As is
discussed in the context of the motion for judgment as a matter
of law, the defendants' evidence of intentional discharges of tar
or tarry wastes and of the effects of any such discharges was
thoroughly disputed through evidence presented by EnergyNorth.
The jury's verdict was not against the clear weight of the
evidence nor does it result in a miscarriage of justice.

###### 4.  Jury instructions.

The defendants argue that the court erred in the instruction
pertaining to whether the contamination was accidental or
intentional and erroneously omitted jury instructions pertaining
to EnergyNorth's agreement with PSNH and the pollution exclusion.
A new trial may be granted due to substantial errors in
instructions to the jury.  Rivera Castillo v. Autokirey, Inc.,
379 F.3d 4, 12 (1st Cir. 2004).  An erroneous instruction
requires a new trial, however, "only if the error was
prejudicial, based on the record as a whole."  Jernberg v. Mann,
358 F.3d 131, 134 (1st Cir. 2004) (internal quotations omitted).

###### a. Intent to cause property damage.

The defendants argue that the subjective intent prong of the
jury instruction on intentional or accidental contamination

15

erroneously omitted "expected."  The jury was instructed that it would decide whether the contamination was caused intentionally or accidentally.  The instructions stated that "the defendant insurers can satisfy their burden of proof that the contamination was intentional in either of two ways:  (1) by proving that the contamination was subjectively intentional; or (2) by proving that the contamination was caused by actions that were inherently injurious."  The court then explained in more detail that subjectively intentional means contamination that was done consciously and knowingly while inherently injurious means an intentional discharge that caused contamination that a reasonable company would have known would cause some injury to property.

As is set forth above, the New Hampshire Supreme Court has "developed two inquiries to determine whether an insured's act was an accidental cause of injury, one subjective, the other objective."  Continental, 146 N.H. at 162; accord Marikar v. Peerless Ins. Co., 151 N.H. 395, 398 (2004).  The first inquiry is subjective, that is, "'an insured's act is not an accidental contributing cause of injury when the insured actually intended to cause the injury that results.'"  Id. (quoting Vermont Mut. Ins. Co., 128 N.H. at 523).  As such, the first inquiry analyzes "the actual intent of the insured."  Marikar, 151 N.H. at 398.  The second inquiry is objective:  "an insured's intentional act cannot be accidental when it is so inherently injurious that 'it

cannot be performed without a certainty that some injury will result.'" Id. (quoting Providence Mut. Fire Ins. Co., 138 N.H. at 306); accord Marikar, 151 N.H. at 398.  An action is inherently injurious if it is "patently hazardous."  Fisher v. Fitchburg Mut. Ins. Co., 131 N.H. 769, 772 (1989).

Despite the clear statement by the New Hampshire Supreme Court, the defendants continue to argue that the first inquiry, the subjective intent analysis, includes "expected" as well as intended contamination.  In other words, the defendants would have the jury instructed that contamination is subjectively intentional if EnergyNorth actually expected it to occur.  What the defendants fail to appreciate is that the "expected" element of intentional conduct is addressed by the second inquiry, that is, whether the conduct was inherently injurious.

The inherently injurious analysis is assessed under the less strenuous objective standard that does not require proof of subjective intent.  The objective inquiry asks whether a reasonable company in EnergyNorth's position would have known that its deliberate discharge was certain to result in some injury to property, although not necessarily the particular injury that did occur.  In other words, the objective inquiry examines whether the contamination resulting from a deliberate discharge would have been expected by a reasonable company, regardless of the actual subjective intentions or expectations of

17

EnergyNorth.  The defendants' proposed instruction would have added to their burden of proof and is contrary to New Hampshire law.

The court is satisfied that the jury was properly instructed.[8]

### b. The agreement.

The defendants argued at trial that their indemnification obligation excluded costs of remediation that are the responsibility of PSNH under an agreement with EnergyNorth.  The defendants interpret that agreement to limit EnergyNorth's liability to contamination that occurred after 1945.  Based on that interpretation, the defendants asked the court to instruct the jury to disregard any contamination that occurred before 1945.

The court denied the defendants' request because nothing in the agreement limited EnergyNorth's liability based on that date or any date.  Instead, the cost allocation in the agreement was expressed in terms of percentages.  There was no basis for

---

[8]In addition to the cited instructions, the jury was also instructed that:  "An accident is an undesigned contingency, a happening by chance, something out of the usual course of things, unusual, unexpected, fortuitous, not anticipated and not naturally occurring."

instructing the jury, as a matter of law, that the agreement meant something that it did not say.

c.  Pollution exclusion.

Some of the defendants' policies included a pollution exclusion, which covered the period between November 15, 1971, and January 29, 1979.  The court previously ruled that under New Hampshire law, the defendants bore the burden of proving that the pollution exclusion barred coverage and declined to follow a ruling by Judge McAuliffe that was made under the federal declaratory judgment statute.[9]  Order, 99-cv-502-JD, Feb. 18, 2005.  At the close of the evidence, the court granted EnergyNorth's motion for partial judgment as a matter of law on the issue of the pollution exclusion, concluding that the defendants had failed to carry their burden of proof.  Order, Nov. 14, 2005, doc. no. 401.  The court finds no error in that ruling.

---

[9]New Hampshire law puts the burden on the insurer to prove in a declaratory judgment action that the applicable policies do not provide coverage.  RSA 491:22-a.  That burden pertains to policy exclusions as well as coverage under the insuring provisions of the policy.  See, e.g., Allstate Ins. Co. v. Crouch, 140 N.H. 329, 331 (1995); Winnacunnet Coop. Sch. Dist. v. Nat'l Union Fire Ins. Co., 84 F.3d 32, 35 (1st Cir. 1996).

II.  <u>Plaintiff's Motion</u>

EnergyNorth moves for clarification of part of the court's order pertaining to the judgment to be entered on the jury's verdict.  Specifically, EnergyNorth questions that part of the order in which the court listed the issues and claims that were not resolved in this litigation, dismissing them without prejudice, and stated that those issues would have to be resolved by the parties "or be raised in a separate proceeding, if that is necessary, after remediation is complete."  EnergyNorth contends that the phrase "after remediation is complete" imposes time constraints on when any further litigation may be brought to address the unresolved issues.

The court did not rule on when any unresolved issues may or may not become ripe.  Instead, the court indicated that the issues that were then unripe were not resolved in the litigation of this case and should not be raised in new litigation until they are ripe for adjudication.  Further, in the interests of judicial economy, it is the court's expectation that to the extent any further litigation of issues arising from this case may become necessary, the parties will refrain from a piece-meal approach and instead will wait to bring the unresolved issues in a single case.

<u>Conclusion</u>

For the foregoing reasons, the defendants' motion for judgment as a matter of law or in the alternative for a new trial (document no. 411) is denied.  The plaintiff's motion for clarification (document no. 412) is granted to the extent the previous order is explained in this order.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

March 15, 2006

cc:  John L. Altieri, Esquire
     Richard T. Apiscopa, Esquire
     Edmund J. Boutin, Esquire
     Kathyanne S. Cohen, Esquire
     Doreen F. Connor, Esquire
     Bruce W. Felmly, Esquire
     Robert P. Firriolo, Esquire
     William P.  Lalor, Esquire
     Lawrence A. Serlin, Esquire